## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DAWN CULLEN,             :
                                 :
             Plaintiff      :     No. 3:16-CV-00026
                                 :
             vs.             :     (Judge Nealon)
                                 :
NANCY A. BERRYHILL, Acting   :
Commissioner of Social Security,[1]   :
                                 :
             Defendant    :

## <u>MEMORANDUM</u>

On January 6, 2016, Plaintiff, Dawn Cullen, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[3] under Titles II and

---

1.  Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017, and thus replaces Carolyn W. Colvin as the Defendant. <u>See</u> <u>http://blog.ssa.gov/meet-our-new-acting-commissioner/</u>. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3.  Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively.  (Doc. 1).  The parties have fully briefed the appeal.  For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] her applications for DIB and SSI on January 22, 2013, and January 24, 2013, respectively, alleging disability beginning on May 1, 2012, due to a combination of Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, and depression.  (Tr. 12).[5]  These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on March 27, 2013.  (Tr. 12).  On May 3, 2013, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 12).   An administrative hearing was held on August 7, 2014, before administrative law judge Daniel Myers, ("ALJ"), at which

---

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on March 14, 2016.  (Doc. 12).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Plaintiff and impartial vocational expert Sheryl Bustin, ("VE"), testified. (Tr. 12). On August 18, 2014, the ALJ issued an unfavorable decision denying Plaintiff's DIB and SSI applications. (Tr. 12-20). On September 10, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On November 2, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 6, 2016. (Doc. 1). On March 14, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 11 and 12). Plaintiff filed a brief in support of her complaint on April 28, 2016. (Doc. 13). Defendant filed a brief in opposition on June 3, 2016. (Doc. 16). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on April 8, 1969, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 172). Plaintiff graduated from high school in 1988, and can communicate in English. (Tr. 175,

---

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

177).  Her employment records indicate that she previously worked as a cashier in the retail industry.  (Tr. 178).  The records of the SSA reveal that Plaintiff had earnings in the years 1990 through 2012.  (Tr. 167).  Her annual earnings range from a low of one hundred thirty-three dollars and zero cents ($133.00) in 1990 to a high of fourteen thousand eight hundred fifty-one dollars and eighty-five cents ($14,851.85) in 2003.  (Tr. 167).  Her total earnings during this twenty-two (22) year period were one hundred sixty-seven thousand nine hundred eleven dollars and ninety-four cents ($167,911.94).  (Tr. 167).

During the administrative hearing on August 7, 2014, Plaintiff testified that she was disabled due to a combination of anxiety, depression, ADHD, and borderline intellectual functioning.  (Tr. 28-29).  She testified that the depression she experienced made her "feel like crying all the time."  (Tr. 39).  She stated that depression made her feel like she did not want to be around or talk to others.  (Tr. 39).  She testified that the Zoloft she was taking for depression helped "some" and did not cause side effects.  (Tr. 38-39).  Regarding anxiety, she stated that it caused her to feel shaky and nervous and caused difficulty breathing and chest heaviness.  (Tr. 39).  She also stated she took Buspirone for anxiety, and that it did not cause side effects.  (Tr. 38).  Regarding ADHD, she stated that this condition caused her to feel hyper and confused, and that the Ritalin that she took for this

condition did not cause any side effects.  (Tr. 38, 41).

Regarding daily activities, she testified that she did not drive, but rather was driven places by her mother.  (Tr. 33).  She testified that she had difficulty staying falling and staying asleep, which caused her to "feel like [she could not] stay awake" during the day.  (Tr. 40).  She used the computer and telephone and watched television.  (Tr. 41-43).

She stated that, at the time of her hearing, she lived with her mother, father, sister, and her sister's husband.  (Tr. 33).  She had a daughter, who was twenty-three (23) at the time of the hearing.  (Tr. 34).  She had a three (3) year old grandson, whom she took care of every other weekend for the entire weekend with the help of her mother and sister.  (Tr. 34-35).  She testified that she also watched the children of her sister's friend "a couple of times . . . spur of the moment" and her daughter's friend's children for an entire summer in 2013.  (Tr. 35-36).

When questioned on her educational background, she stated that she took special education classes in high school because she had trouble learning and concentrating.  (Tr. 42).

## MEDICAL RECORDS

On August 14, 2012, Plaintiff had an appointment with Beverly J. Dillon, PA-C.  (Tr. 274).  It was noted that Plaintiff: was depressed; experienced crying

spells; had a decrease in focus, concentration, energy, and motivation; experienced racing thoughts; and did not have suicidal ideations. (Tr. 274). An examination revealed a diagnosis of depression and anxiety, for which Plaintiff was prescribed Celexa. (Tr. 274). Beverly Dillon, PA-C opined that Plaintiff was able to work, and that she needed aid with her medical expenses and prescriptions. (Tr. 277).

On February 11, 2013, Plaintiff underwent an initial intake evaluation performed by Mary McCubbin, M.D., at Huntingdon Counseling and Psychiatric Services due to complaints of anxiety and a depressed mood. (Tr. 303). It was noted that, while Plaintiff had been depressed much of her life, it had been manageable until a few years prior to the appointment, and that at the time of the appointment, she was depressed daily without an identifiable reason. (Tr. 303). It was noted that Plaintiff experienced: anhedonia; weight gain; difficulty sleeping; daytime napping; mild psychomotor agitation; low energy; poor motivation; feelings of helplessness, hopelessness, and worthlessness; problems concentrating; excessive worry; feeling of physical tenseness; feelings that other people were talking about, watching and/ or judging her; avoidance of friends and crowds; memory problems; and difficulty focusing and paying attention to details. (Tr. 303-304). Her medical history included morbid obesity, hyperlipidema, and seasonal allergic rhinitis. (Tr. 304). Her educational history noted that she was in

special education from elementary school through high school; that she graduated from high school; and that she attended a trade school for two (2) to three (3) years after high school, but did not complete the program. (Tr. 305). Her mental status examination revealed Plaintiff: was neatly dressed and groomed; had a depressed and anxious mood; and had an affect restricted in range. (Tr. 305). She was diagnosed as having Major Depressive Disorder, recurrent, moderate; Social Phobia; Dysthymic Disorder; ADHD; morbid obesity; hyperlipidemia; and seasonal allergic rhinitis. (Tr. 306). Dr. McCubbin switched Plaintiff from Citalopram to Zoloft, increased the Buspirone dosage, and instructed Plaintiff to continue psychotherapy. (Tr. 307).

On February 21, 2013, Plaintiff had a follow-up appointment with Jonathan Aromatorio, MA, at Huntingdon Counseling. (Tr. 309). It was noted that Plaintiff reported she: was feeling down and depressed on and off for much of her life; was an anxious person; was uncomfortable in crowds of people or with people she did not know; has a learning disability and that she is "slow," which caused self-consciousness and feelings of guilt; and was living with her parents, where she had no privacy and slept on the couch in the living room, which caused feelings of worthlessness and caused stress. (Tr. 309). She reported that she was experiencing depression, anxiety, anhedonia, hopelessness, interrupted sleep,

insomnia, sleep apnea, issues with concentration, and a withdrawn feeling. (Tr. 309). A mental status examination revealed: Plaintiff's memory, perception, appearance, motor activity, speech, and activities of daily living were within normal limits; her primary mood was anxious and her secondary mood was depressed; her affect was constricted; her attitude was cooperative; her self-concept was self-deprecating; her judgment and thought were intact; and her orientation was full. (Tr. 309). Plaintiff reported no change in her feelings of depression or anxiety. (Tr. 309). The plan was for Plaintiff to be aware of when she was putting herself down. (Tr. 309).

On March 4, 2013, Plaintiff had a follow-up appointment with Jonathan Aromatroio, MA, at Huntingdon Counseling. (Tr. 308). Plaintiff reported she had not been as tired and had not been sleeping as much during the day; was bored easily on the days she did not babysit her grandson; worried more during "downtime;" felt that having her own space would help her mood; and was "mostly calm because not much ha[d] been going on." (Tr. 308). She reported that she was experiencing depression, anxiety, anhedonia, hopelessness, interrupted sleep, issues with concentration, and a withdrawn feeling. (Tr. 308). A mental status examination revealed: Plaintiff's memory, perception, appearance, motor activity, speech, and activities of daily living were within normal limits; her

primary mood was anxious and her secondary mood was depressed; her affect was constricted; her attitude was cooperative; her self-concept was self-deprecating; her judgment and thought were intact; and her orientation was full. (Tr. 308). Plaintiff reported no change in her feelings of depression or anxiety. (Tr. 308). The plan was for Plaintiff to be aware of when she was putting herself down and to identify triggers to symptoms and related thinking. (Tr. 308).

On March 21, 2013, Plaintiff had an appointment with Dr. McCubbin. (Tr. 340). It was noted that Plaintiff reported that she: continued to have a depressed mood more days than not with crying spells and feelings of helplessness, hopelessness and worthlessness often; felt tired much of the time, but not as tired as when she was first seen; felt a little bit better overall; felt an internal sense of agitation and jitteriness; denied problems with her medications; and was leaving her home more often over the few weeks prior to the appointment. (Tr. 340). Her mental status examination revealed she had: normal speech; a mostly sad affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; a depressed mood; and intact insight and judgment. (Tr. 340). Plaintiff's medications included Zoloft and Buspirone. (Tr. 340). Plaintiff's diagnoses included Major Depressive Disorder, recurrent and moderate; Social Phobia; Obsessive Compulsive Disorder; and ADHD. (Tr. 340). Plaintiff's Zoloft

dosage was increased, and she was scheduled for a follow-up appointment in four (4) weeks. (Tr. 340).

On March 26, 2013, Monica Yeater, Psy.D. performed a Psychiatric Review Technique, ("PRT"), and completed a Mental Residual Functional Capacity Assessment form based on the medical records up to that date. (Tr. 54-59). In the PRT, Dr. Yeater noted that Plaintiff had mental health impairments that fell under Impairment Listings 12.02, 12.04 and 12.06. (Tr. 56). She opined that, regarding the "B" criteria of these Listings, Plaintiff had: (1) mild restrictions in activities of daily living and mild difficulties in maintaining social functioning; (2) moderate difficulties in maintaining concentration, persistence or pace; and (3) no repeated episodes of decompensation, each of extended duration. (Tr. 56). She also stated that evidence did not establish the presence of "C" criteria for these Impairment Listings. (Tr. 56). Dr. Yeater stated Plaintiff was partially credible, and based her opinions in the PRT and Mental Residual Functional Capacity form on the report submitted by Charles Kennedy, Ph.D. because it was "fairly consistent with the mental residual functional capacity assessment that was determined in this decision. Therefore, the report that was submitted by Charles Kennedy, Ph.D, and was received on 3/25/13 is given great weight and is adopted in this decision." (Tr. 57). A review of the entire Transcript does not reveal any report prepared by

Charles Kennedy, Ph.D.

In the Mental Residual Functional Capacity form completed the same day, Dr. Yeater opined that, regarding limitations with sustained concentration and persistence, Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 57-58). Dr. Yeater noted Plaintiff could make simple decisions, carry out very short and simple instructions, and maintain regular attendance and be punctual. (Tr. 58). Dr. Yeater further opined that, regarding adaption limitations, Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (Tr. 58). Dr. Yeater stated Plaintiff could sustain an ordinary routine without special supervision. (Tr. 58).

On May 20, 2013, Plaintiff had an appointment with Dr. McCubbin. (Tr. 338). It was noted that Plaintiff reported that she: was still having problems with depression and anxiety; felt jittery most days, with a notation that Plaintiff shook her legs throughout the appointment; was applying for disability; had difficulty with concentration; needed to be reminded to do things others have asked her to

do; felt depressed more days than not and hopeless at times; denied the use of alcohol and other substances; had anxiety in public and crowded spaces; and denied having panic attacks. (Tr. 338). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 338). Plaintiff's Zoloft and Buspirone dosages were increased, and Wellbutrin was prescribed to address her depressed mood and attention problems. (Tr. 338). Plaintiff was scheduled for a follow-up appointment in four (4) weeks. (Tr. 339).

On June 20, 2013, Plaintiff had an appointment at Huntingdon Counseling with Carlie Frederick, CRNP, due to Dr. McCubbin's unavailability. (Tr. 336). It was noted that Plaintiff reported that she: was taking her medications as prescribed and felt better than before with lingering depression; felt more motivated, energetic and less sad during the day, but also felt empty and anxious; was overwhelmed with stressors; watched her grandchild and neighbor's children during the daytime and in the evening; had lowered levels of anxiety, but that she continued to experience distress in public places and when meeting new people; and denied having side effects from her medications. (Tr. 336). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent

affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 336). Plaintiff's medications included Zoloft, Buspirone, and Wellbutrin. (Tr. 336). Plaintiff was scheduled for a follow-up appointment in four (4) weeks. (Tr. 331).

On July 25, 2013, Plaintiff had an appointment with Dr. McCubbin. (Tr. 335). It was noted that Plaintiff reported that she: had to stop taking Wellbutrin because it was causing a rash; was having problems with a depressed mood, but was better than when she started; had moderate anhedonia with a "blah" mood; was babysitting a twelve (12) year old girl and three (3) other children with blunted enjoyment of time spent with these children; had improved sleep without difficulty falling asleep or early awakening; had a good appetite; and denied problems with concentration, guilty, or suicidal ideation. (Tr. 335). It was also noted that an ADHD screen done at this appointment was consistent with ADHD. (Tr. 335). Her mental status examination revealed she had: normal speech; a full range and mood congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 335). Plaintiff's medications included Zoloft, Buspirone, Methylphenidate, and Wellbutrin. (Tr. 335). Dr.

McCubbin instructed Plaintiff to discontinue Wellbutrin due to the rash, and prescribed Methylphenidate due to insufficient improvement in her mental health diagnoses. (Tr. 335). Plaintiff was scheduled for a follow-up appointment in four (4) weeks. (Tr. 335).

On September 12, 2013, Plaintiff had an appointment with Dr. McCubbin. (Tr. 334). It was noted that Plaintiff reported she: was feeling "ok;" had difficulty getting to sleep, sleeping about six (6) hours total a night; had varying energy levels; had depression that was somewhat better; felt people stared at her when she was in public; was no longer babysitting; felt calmer after starting the Methylphenidate; and was able to complete tasks more easily. (Tr. 334). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 334). Plaintiff's medications included Zoloft, Buspirone, and Methylphenidate. (Tr. 334). Plaintiff's diagnoses included Major Depressive Disorder, partial remission; Social Phobia; Dysthymic Disorder; and ADHD. (Tr. 334). Plaintiff was scheduled for a follow-up appointment in eight (8) weeks. (Tr. 334).

On September 12, 2013, Dr. McCubbin completed a "Mental Capacity

Assessment" form for Plaintiff. (Tr. 312-314). Dr. McCubbin opined Plaintiff

had: (1) slight restrictions in the ability to ask simple questions or request

assistance and the ability to maintain socially appropriate behavior and to adhere

to basic standards of neatness and cleanliness; (2) moderate restrictions in the

ability to understand, remember, and carry out detailed instructions and to respond

to appropriately to changes in the work setting; (3) marked restrictions in the

ability to maintain attention and concentration for extended periods of time, to

work in coordination with or in proximity to others without being distracted by

them, to complete a normal workday and workweek without interruptions from

psychologically based symptoms, and to travel in unfamiliar places or use public

transportation; and (4) no restrictions in her ability to remember locations and

work-like procedures, to understand, remember, and carry out very short and

simple instructions, to make simple work-related decisions and to be aware of

normal hazards and take appropriate precautions. (Tr. 312-314). Dr. McCubbin

explained that Plaintiff's long-standing problems with attention and concentration

and her resulting symptoms from anxiety and depression support these restrictions

as opined. (Tr. 312-314).

On November 5, 2013, Plaintiff had an appointment with Dr. McCubbin.

(Tr. 333). Plaintiff reported she was anxious and nervous; denied a depressed or

elevated mood; and had been experiencing her "usual" sleep and energy. (Tr. 333). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 333). Plaintiff's medications included Zoloft, Buspirone, and Methylphenidate. (Tr. 333). Plaintiff's diagnoses included Major Depressive Disorder, partial remission; Social Phobia; Dysthymic Disorder; and ADHD. (Tr. 333). Plaintiff was scheduled for a follow-up appointment in eight (8) weeks. (Tr. 333).

On February 25, 2014, Plaintiff had an appointment with Dr. McCubbin. (Tr. 332). Plaintiff reported that she was feeling good; denied a depressed or elevated mood; was sleeping well at night; had fine energy in the afternoon and evening; was able to concentrate and complete tasks with Methylphenidate; had anxiety in crowded places; and felt like things were crowding in on her in places with too many people. (Tr. 332). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 332). Plaintiff's medications included Zoloft, Buspirone, and Methylphenidate. (Tr.

16

332). Plaintiff's diagnoses included Major Depressive Disorder, partial remission; Social Phobia; Dysthymic Disorder; and ADHD. (Tr. 332).

On April 22, 2014, Plaintiff had an appointment with Dr. McCubbin. (Tr. 331). It was noted that Plaintiff reported: she was "feeling good;" was sleeping better; denied a depressed or elevated mood; was able to concentrate adequately and complete tasks with Methylphenidate; had some problems with anxiety when in a crowded place; and denied problems with side effects to the medications. (Tr. 331). Her mental status examination revealed she had: normal speech; a full-range and mood-congruent affect; a cooperative attitude; a perception within normal limits; a logical and goal-directed thought process; an anxious mood; and minimally impaired insight and judgment. (Tr. 331). Plaintiff's medications included Zoloft, Buspirone, and Methylphenidate. (Tr. 331). Plaintiff's diagnoses included Major Depressive Disorder, partial remission; Social Phobia; Dysthymic Disorder; and ADHD. (Tr. 331). Plaintiff was scheduled for a follow-up appointment in eight (8) weeks. (Tr. 331).

On June 17, 2014, Plaintiff had an appointment with Dr. McCubbin at Huntingdon Counseling. (Tr. 330). It was noted that Plaintiff: denied a daily depressed mood; reporting having six (6) to seven (7) days a month on average when she was "down in the dumps," during which she would be tearful, endorse

anhedonia, wake early, have excessive daytime sleepiness and decreased energy, feel hopeless, helpless, and worthless, and experience problems with concentration; was able to concentrate and complete tasks without distraction when in a good mood; was anxious if there were more than two (2) people in an aisle in a store, which would cause her to leave; felt that people looked at and judged her negatively in public; sometimes experienced panic attacks in small groups of strangers; and was hyper-vigilant and easily startled. (Tr. 330). A mental status examination revealed Plaintiff had: normal speech; an affect in full range and congruent to mood; a cooperative attitude; a normal perception; a logical and goal-directed thought process; an anxious mood; minimally impaired insight and judgment; and restless motor activity. (Tr. 330). Plaintiff was provided with psychoeducation and supportive psychotherapy and paperwork was completed. (Tr. 330).

On June 17, 2014, Dr. McCubbin completed a second "Mental Capacity Assessment" form for Plaintiff. (Tr. 343-345). Dr. McCubbin opined Plaintiff had: (1) slight restrictions in the ability to make simple work-related decisions and to ask simple questions or request assistance; (2) moderate restrictions in the ability to understand, remember, and carry out detailed instructions and to maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness; (3) marked restrictions in the ability to maintain attention and concentration for extended periods of time, to work in coordination with or in proximity to others without being distracted by them, to interact appropriately with the general public, and to travel in unfamiliar places or use public transportation; (4) extreme restrictions in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (5) no restrictions in her ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, and to be aware of normal hazards and take appropriate precautions. (Tr. 343-345). Dr. McCubbin also opined that Plaintiff would be absent from work more than four (4) times per month due to depression that caused difficulty with attention and concentration, "particularly on a sustained basis, despite medication . . . [and] social anxiety [that] would also interfere with concentration." (Tr. 344). Dr. McCubbin explained that Plaintiff's diagnoses of depression, anxiety, and social phobias supported his opinion. (Tr. 344-345).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld. 42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id. As part of step four, the Commissioner must

determine the claimant's residual functional capacity. Id. If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled. Id. "The claimant bears the ultimate burden of establishing steps one

through four." Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996). A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule. The residual functional capacity assessment must include a

discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, [if the claimant is not able to perform past relevant work,] the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2016. (Tr. 14). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of May 1, 2012. (Tr. 14).

At step two, the ALJ determined that Plaintiff suffered from the severe[8]

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

combination of impairments of the following: "attention deficit hyperactivity disorder (ADHD), anxiety and depression (20 C.F.R. 404.1520(c) and 20 C.F.R. 404.1520(c))." (Tr. 14-15).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 15-17).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with some limitations. (Tr. 16-20). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels. However, [Plaintiff] retains the mental capacity for work that does not require interaction with the public or working as a member of a team, has occasional interactions with co-workers and supervisors, and requires routine, repetitive work in a stable environment.

(Tr. 16).

The ALJ concluded that Plaintiff "is capable of performing past relevant work as a hand packer. This work does not require the performance of work-related activities precluded by [Plaintiff]'s [RFC] (20 CFR 404.1565 and

416.965)." (Tr. 20). Because the ALJ determined Plaintiff could perform past relevant work, the ALJ did not need to proceed to Step Five of the Sequential Evaluation Process.

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between May 1, 2012, the alleged onset date, and the date of the ALJ's decision. (Tr. 20).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erred in the assessment of Plaintiff's history of a learning disability; (2) the RFC determination is not supported by substantial evidence; (3) the ALJ's credibility determination is not supported by substantial evidence; and (4) the ALJ's determination that Plaintiff could perform past relevant work is not supported by substantial evidence. (Doc. 13, pp. 7-14) . Defendant disputes these contentions. (Doc. 16, pp. 12-24).

### 1.    Residual Functional Capacity Determination

On appeal, Plaintiff challenges the ALJ's RFC determination, arguing that substantial evidence does not support the weight the ALJ gave to the medical opinions because: the ALJ failed to fully develop the record; the ALJ failed to take into account the Treating Physician Rule; the ALJ failed to reconcile or address the inconsistencies between the contents of the medical opinions and the resulting

26

RFC; and ALJ gave great weight, and based the entire RFC, on one opinion that was based on review of an incomplete record. (Doc. 13, pp. 8-12). Defendant disputes these contentions. (Doc. 16, pp. 14-21).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances."  SSR 96-6p, 1996 SSR LEXIS 3.  This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source."  Id. (emphasis added).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence.  Morales, 225 F.3d at 316-18.  An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion.  Id.  An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility."

Id.  As one court has stated, "Judges, including administrative law judges of the

Social Security Administration, must be careful not to succumb to the temptation

to play doctor" because "lay intuitions about medical phenomena are often

wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Regardless of what the weight an administrative law judge affords to

medical opinions, the administrative law judge has the duty to adequately explain

the evidence that he or she rejects or affords lesser weight.  Diaz v. Comm'r of

Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009).  "The ALJ's explanation must be

sufficient enough to permit the court to conduct a meaningful review."  Burnett v.

Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In the case at hand, regarding the medical opinion evidence involving

Plaintiff's mental health impairments, the ALJ gave no weight to the

aforementioned opinions of Plaintiff's treating psychiatrist, Dr. McCubbin, with

whom Plaintiff had over ten (10) appointments over more than a sixteen (16)

month timeframe.  (Tr. 19, 326-336).  The ALJ explained that limited weight

should be given to these two (2) opinions rendered almost nine (9) months apart

from each other by the same physician because they were not supported by the

record and Dr. McCubbin's own examination findings.  (Tr. 19).  Instead, the ALJ

gave great weight to the opinion of Dr. Yeater, the state agency psychologist,

because it was supported by the longitudinal clinical evidence, Plaintiff's improvement with treatment, and her activities of daily living. (Tr. 19).

Plaintiff asserts that the ALJ erred in relying on Dr. Yeater's opinion to formulate the RFC, and this Court agrees, in accordance with precedent from the United States Court of Appeals for the Third Circuit. The Third Circuit has not upheld any instance, in any precedential opinion, in which an administrative law judge has assigned less than controlling weight to an opinion rendered by a treating physician based solely on one (1) opinion from a non-treating, non-examining examiner who did not review a complete case record. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011) (holding that the administrative law judge did not err in affording more weight to a medical opinion rendered by a non-examining physician because the physician testified at the oral hearing and had a chance to review the entire case record); Brownawell v. Commissioner of Social Security, 554 F.3d 352 (3d Cir. 2008) (holding that three (3) non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory' and omitted significant objective findings promulgated after the non-treating opinions were issued); Morales, 225 F.3d at 314 (holding that remand was proper because the claimant's residual functional capacity was based on an opinion rendered by a non-treating, non-examining physician who "review[ed]

[claimant's] medical record which . . . did not include [two physicians'] reports" and was thus based on an incomplete medical record). Upon review of the entire record and the ALJ's RFC determination, it is determined that, in light of these precedential opinions, the ALJ improperly afforded great weight to the opinion of the non-treating, non-examining psychologist, Dr. Yeater, in determining Plaintiff's RFC because Dr. Yeater rendered her opinion before Plaintiff attended monthly psychiatric appointments spanning more than a year and before two (2) opinions were rendered by Plaintiff's treating psychiatrist, Dr. McCubbin, and thus, on an incomplete record. (Tr. 312-314, 330-338, 343-345). An administrative law judge's RFC determination is not supported by substantial evidence when significant medical findings and events occur after the rendering of an opinion that was soley relied on by the ALJ in determining Plaintiff's mental RFC. The ALJ, in the case at hand, did not rely on any other opinion in formulating the RFC.

Furthermore, this Court takes issue with the fact that Dr. Yeager stated she formulated her opinion in reliance on a medical report supposedly issued by Charles Kennedy, Ph.D., a report that this Court is unable to locate anywhere in the Transcript provided by Defendant. Therefore, it is concluded that the ALJ erred in the weight he afforded to the medical opinions of record, and thus the

ALJ's decision is not supported by substantial evidence.

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: September 18, 2017

/s/ **William J. Nealon**
**United States District Judge**